UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK G. WEINBERG, | ) | |
| | ) | |
| Plaintiff, | ) | No. 01 C 1139 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge |
| CITY OF CHICAGO, | ) | Arlander Keys |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Mark Weinberg, a passionate hockey fan, wrote a witty but biting book entitled "*Career Misconduct, The Story of Bill Wirtz's Greed, Corruption and the Betrayal of Blackhawks' Fans.*" Mr. Weinberg attempted, with some success initially, to sell his book at the United Center, the very venue in which his beloved Blackhawks played and the venue from which Bill Wirtz, at least in Mr. Weinberg's mind, ran his evil empire. On February 16, 2001, several Chicago police officers confronted Mr. Weinberg at the United Center and told him that if he did not cease selling his book, he would be arrested. The police suggested an alternate selling site – a less than ideal spot, more isolated and remote and arguably less safe than his spot of choice. He left the United Center willingly, but was affected by the experience; he was angry, agitated and, some would say, obsessed with the notion that his rights had been violated when the City stopped him from selling the fruits of his labor. He sued the

City of Chicago and, as it turned out, the United States Court of Appeals for the Seventh Circuit agreed that Mr. Weinberg's rights had, indeed, been violated by the City's actions. Specifically, the court held that the ordinance that allegedly gave the police the authority to shut Mr. Weinberg down failed to pass muster under the Constitution.

On January 18 and 19, 2005, this Court held a bench trial on one of the remaining issues in the case: the question of damages. The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## FINDINGS OF FACT

At the bench trial on damages, Mr. Weinberg presented three witnesses. He first called Miriam Fisch, a former girlfriend, who testified that she started dating Mr. Weinberg in the fall of 2000, right around the time his book was being published. Tr. at 6. Ms. Fisch testified that she dated Mr. Weinberg from October 2000 to December 2001, and that, on occasion, she would accompany him to the United Center and help to sell his books; in fact, she testified, she was out there selling on the night of February 16, 2001. Tr. at 8-11.

---

[1]To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

Ms. Fisch testified that, on that night, the police approached Mr. Weinberg and told him that he had to stop selling his book; they also told him that, if he refused to stop selling, or if he came out again, he would be arrested. Tr. at 14. She testified that Mr. Weinberg was upset about the encounter – in her words, he was "in shock" and he was "a little bit agitated about it"; "he was frightened and he was upset"; "he couldn't believe that this was happening, and he was just – he was kind of tense and he was agitated about it." Tr. at 14-15. Ms. Fisch testified that Mr. Weinberg obsessed about his encounter and about the fact that he had been prevented from selling his book. She testified that he continued to obsess about the situation and continued to be agitated about the situation, long after that night; she testified that he lost his ability to concentrate at times, and the whole situation affected his social relationships. Tr. at 19-20. Ms. Fisch testified that Mr. Weinberg's obsessiveness and agitation was "cyclical in reaction to whatever was happening in the lawsuit." Tr. at 20-21. She testified that the situation affected his ability to sleep; she testified that during some periods, he would wake up in the middle of the night or in the wee hours of the morning and have to soak in the bathtub to try to calm himself down. Tr. at 21.

On cross examination, Ms. Fisch conceded that the police officers had offered to let Mr. Weinberg and his helpers sell the

book at an alternate location, but she testified that they chose not to take the police up on that offer because the location the police proposed was less desirable and, in her mind, downright dangerous, given its proximity to the public housing projects. Tr. at 26-27, 29-30.

Mr. Weinberg next called Laura Feldman, who testified that her husband and Mr. Weinberg are "dear friends" and that she has known Mr. Weinberg socially and seen him regularly for the past 25 years. Tr. at 32. Ms. Feldman testified that, on February 16, 2001, she was at the United Center to attend the Blackhawks game, and, as she always did when she went to a game at the United Center, she went to find Mr. Weinberg, to say hello. That night, she found him and gave him a hug to say hello, and quickly realized that she had "walked into the middle of something." Tr. at 34. She testified that Mr. Weinberg, who would normally have greeted her with a hug, friendly enthusiasm and some social chatter, just stood there, looking "ashen and frightened"; she testified that his face was "wide-eyed, kind of pale and looking above me, like off to the distance." Tr. at 34-35. She testified that Mr. Weinberg was clearly having an argument with some men, that she saw those men getting into a white van, and that she then saw Mr. Weinberg walk away with Ms. Fisch. Tr. at 35-36. She recalled asking him if he was okay, and he responded with "[d]on't worry, I'll be fine" or something similar. Tr. at

4

36. She testified that, although she did not remember the exact words exchanged between Mr. Weinberg and the men in the van, she knew the tenor of the conversation was not polite; in fact, she recalled loud voices and she perceived the encounter as being intimidating. Tr. at 39-40.

Mr. Weinberg took the stand next. He testified that he loves sports – loves hockey in particular – and that, in about 1991, he decided to combine his interest in sports, his passion for writing, and his idea that the desktop publishing revolution created a fabulous business opportunity; he testified that he left his job at a major law firm and gave up the practice of law to pursue his own business. Tr. at 43. The first product of his new business venture was "The Blue Line," a hockey program that Mr. Weinberg sold at the Chicago Blackhawks home games. Tr. at 43. The Blue Line contained updated statistical information, critical analysis of the team, the owners, and the players, and "humorous satire." Tr. at 44. Mr. Weinberg wrote and published a new edition of The Blue Line for every home game and stood on the sidewalk outside the arena, first at Chicago Stadium and then at the United Center, beginning about an hour before the games, selling the program to Blackhawks fans. Tr. at 45. He testified that his sidewalk sales accounted for 99% of his Blue Line sales business. Tr. at 45.

Mr. Weinberg testified that he and his teams of sellers

always sold *The Blue Line* on the public sidewalk surrounding the stadiums, because that was his understanding of what the law allowed. Tr. at 46. He testified that the old Chicago Stadium was surrounded by a regular, roughly six-foot wide sidewalk, and so it was easy to determine where they could legally sell their programs. Tr. at 46. But, he testified, with the United Center, the line was not so easily drawn. In fact, he testified that he actually went to the City's Maps and Plats Department, figured out what was public property and what was private property, and then measured outside the stadium to determine where the public sidewalk would be. Tr. at 46-47. And that is where he stood to sell his programs, and later his books.

Mr. Weinberg testified that, in the beginning of 1998, he decided to stop publishing *The Blue Line*. Tr. at 53. He testified that, after shutting down *The Blue Line*, he decided to write the book about Bill Wirtz, and he spent from the end of 1999 to the end of 2000 researching and writing the book he ultimately titled "*Career Misconduct.*" Tr. at 53-54, 56. Mr. Weinberg testified that he planned to market the book to the same people who bought *The Blue Line*, "mostly disgruntled Blackhawk fans," as he put it. Tr. at 59. He testified that he intended to sell his book on the public sidewalk surrounding the United Center. Tr. at 59. He testified that his book was ready for sale on December 27, 2000. Tr. 61.

6

In addition to his planned street sales, Mr. Weinberg testified that he intended to sell his book in local book stores and on the Internet; he testified that he was able to persuade five or six area Border's and Barnes & Noble stores to offer the book, he arranged to have it sold at a local Chicago book store and through amazon.com, and he also set up his own website, where customers could either purchase the book using a related credit card service company, or get his telephone number and place an order via the telephone. Tr. at 61-62. Mr. Weinberg also advertised the book in "The Crease," another hockey program that was sold on the sidewalks outside the United Center. Tr. at 63. Mr. Weinberg testified that he also did two or three radio interviews to try to promote his book, and that the Tribune, the Sun-Times, and the Daily Herald all wrote about the book as well. Tr. at 64-65.

With respect to his street sales efforts, Mr. Weinberg testified that his book was ready to be sold on December 27, 2000, and that that very night he loaded up a bunch of books in the trunk of his car and went out to sell them at the Blackhawks game at the United Center; he testified that he positioned himself on the public sidewalk on the east corner of Madison Street. Tr. at 66. He testified that, after he had been out there for about five minutes, two United Center security guards came out and told him that he couldn't sell his book within a

7

thousand feet of the stadium. Tr. at 66-67. Mr. Weinberg testified that the situation "blew up"; the guards threw him to the ground, handcuffed him, and hauled him into the United Center, they wrote up a complaint and then passed him off to the police, who then took him to the police station. Tr. at 67-68.

Mr. Weinberg testified that, during the seven year period when he was selling The Blue Line, he had had two previous encounters with the police or the United Center security. In the first incident, which occurred in February 1991, three games after he started selling The Blue Line, two undercover officers arrested him for obstruction of pedestrian traffic; those charges were quickly dismissed. Tr. at 52. In the second incident, which occurred in 1995, United Center security personnel detained him, "drafted up a complaint that [he] was trespassing and then passed [him] off to the police." Tr. at 52.

Mr. Weinberg testified that, after the December 27th incident, he was allowed to sell his book, without incident, at the United Center until February 14, 2001. On that night, he was selling his book on the sidewalk on Madison Street, when two undercover police officers approached him and told him he couldn't sell his book. Tr. at 69, 72. Mr. Weinberg testified that the exchange "was very polite"; he left without selling a single book. Tr. at 73-74. He testified that, the next day, he had his lawyer send a letter to the City explaining what had

happened and outlining what Mr. Weinberg and his lawyer believed the law allowed them to do at the United Center. Tr. at 74-75.

On February 16, 2001, Mr. Weinberg again attempted to sell his books from the sidewalk outside of the United Center, and he was again stopped by undercover police officers. Tr. at 75-76. Mr. Weinberg testified that, up until that point, he had truly believed that the hassles he had endured were merely a function of a misunderstanding concerning the law; on the night of the 16th, however, he realized that this was actually "a directed effort [by the City] to get me off the streets." Tr. at 77. Mr. Weinberg testified that the police officers told him that, if it were up to them, he could continue to sell, but that they had been instructed by the City to shut him down; he testified that they told him that if he came out again, he would be arrested, a threat he took very seriously. Tr. at 79-80, 84. Mr. Weinberg testified that, given the threat of arrest, he left; he testified that the whole encounter left him "stressed out" and "anxious" because he had invested a lot in his book and was now being prevented from selling it. Tr. at 85.

Mr. Weinberg testified that, a few days after the February 16th encounter, he filed this lawsuit, and obtained a Court Order allowing him to sell his book at the United Center while the lawsuit was pending. Tr. at 86-87. Mr. Weinberg testified that that run ended on January 14, 2002, when the Court's ruling

9

allowed the City to again enforce its ordinance against him. Tr. at 99. He testified that, because of that ruling, he was precluded from selling his book from January 14, 2002 to November 20, 2002. Tr. at 99-100.

With respect to his emotional state during this ordeal, Mr. Weinberg testified that the night of the incident, he was nervous and shaken and unable to sleep. Tr. at 85-86. On cross examination he clarified that he normally fell asleep around 11:00 p.m., but on this night, he was unable to fall asleep until about 2:00 a.m. Tr. at 176. He also testified that, even after that night, he was "edgy" and "kind of agitated and upset about this whole thing." Tr. at 101-02.

With respect to his lost street sales, Mr. Weinberg testified that he was forced to miss three games in February 2001, and that, based on his experience, he estimates conservatively that he would have sold 40 books per game at each of those games. Tr. at 114-15. He testified that he was also forced to miss seventeen regular season home games during the period from January 14, 2002 to April 14, 2002, and that he estimates that he would have gone to at least 15 of those games, where he would have sold somewhere in the neighborhood of 22 to 25 books per game. Tr. at 116, 118-19. Mr. Weinberg testified that his estimate was based upon his prior sales numbers (both within the 2000-2001 season, and within the first few months of

the 2001-2002 season), and based upon what was going on with the Blackhawks at the time; according to Mr. Weinberg, the Blackhawks were actually having a good season in 2001-2002, and therefore attendance - particularly attendance of the type of hard-core fans that would be likely to buy his book - was up. Tr. at 118-19.

Additionally, Mr. Weinberg testified that he was denied the opportunity to sell his books at two playoff games, on April 21 and 23, 2002; he testified that the Blackhawks have only made the playoffs once since 1997, and it just happened to be in 2002, the year in which he was prohibited from selling his book outside the United Center. Tr. at 105. He estimated that he would have sold about 30 books at each of the playoff games. Tr. at 125. Mr. Weinberg also testified that he was prohibited from selling his book at the first 11 home games of the 2002-2003 season, and he estimates that he would have attended roughly 8 of those games and sold approximately 13 books per game. Tr. at 126-27.

Beyond his lost street sales, Mr. Weinberg testified that the City's actions caused him to lose sales through other channels. Mr. Weinberg testified that his interactions with people at the United Center frequently resulted in subsequent book sales via other means; for example, some fans at the United Center would tell him that they wanted to buy the book but didn't have the money right then, so Mr. Weinberg would direct them to a

11

book store that carried the book or tell them to visit his website to buy the book. Tr. at 90.

Mr. Weinberg testified that his being on the street absolutely increased his off-the-street sales. Tr. at 138. He testified that, in the year 2001, his book generated almost $21,000 in income; roughly $9,000 of that came from sales made on the street at the United Center, and the other roughly $12,000 came from sales through all other sources. Tr. at 135. He testified that, based on those numbers, he estimates that, in addition to the sales he lost by being denied the opportunity to sell his book at the United Center, he lost another $4,000 to $6,000 in off-street sales. Tr. at 140. Mr. Weinberg testified that, although he thinks the shut-down hampered his sales in the years 2003 and 2004, he is not seeking any damages from those years. Tr. at 141-42.

After Mr. Weinberg concluded his testimony, counsel gave brief closing arguments. Counsel for Mr. Weinberg asked the Court to award $8,000 in lost street sales, plus another $4,000 to $6,000 in "off-street sales"; he also asked for $5,000 to $10,000 to compensate Mr. Weinberg for his emotional distress and mental anguish, and another $15,000 to $20,000 to compensate Mr. Weinberg for the fact that his First Amendment rights were violated and for the fact that he was denied the opportunity to publish his speech for a period of time. In response, counsel

for the City argued that, although Mr. Weinberg is entitled to some measure of damages for lost sales, plaintiff's estimates are vastly exaggerated; counsel for the City also argued that, given the facts of the case, neither emotional distress damages, nor straight constitutional harm damages are appropriate.

## Conclusions of Law

The Seventh Circuit has already determined the constitutionality of the City of Chicago ordinance that purportedly authorized the police to stop Mr. Weinberg from selling his book on the sidewalks outside the United Center, and the court has already determined that Mr. Weinberg's constitutional rights were, in fact, violated by the City's enforcement of the ordinance against Mr. Weinberg. *See Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002). The only question before this Court is the question of damages.

"'[T]he basic purpose' of §1983 damages is 'to *compensate persons for injuries* that are caused by the deprivation of constitutional rights.'" *Memphis Community School District v. Stachura*, 477 U.S. 299, 307-08 (1986)(quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)(emphasis in original). To that end, damages under §1983 may cover out-of-pocket losses and other monetary harms, as well as mental anguish. *Id.* at 307. Damages are not permitted, however, when an established constitutional violation produces no injury; as the Supreme Court has

instructed, "[r]ights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests." *Carey*, 435 U.S. at 254; *Stachura*, 477 U.S. at 307-08. Thus, "the abstract value of a constitutional right may not form the basis for §1983 damages"; rather, "whatever the constitutional basis for §1983 liability, such damages must always be designed 'to compensate injuries caused by the [constitutional] deprivation.'" *Stachura*, 477 U.S. at 308-309 (quoting *Carey*, 435 U.S. at 265).

As the plaintiff, Mr. Weinberg had the burden of proving his damages. The Court does not require him to prove his damages with absolute certainty or mathematical precision, but a damages award may not be based solely upon mere speculation either. *See Havoco of America, Ltd. v. Sumitomo Corporation of America*, 971 F.2d 1332, 1345 (7th Cir. 1992); *Harbor House Condominium Association v. Massachusetts Bay Insurance Co.*, 915 F.2d 316, 319 (7th Cir. 1990). Rather, any award of damages – even if based upon estimates – must be established to a reasonable certainty. *Havoco*, 971 F.2d at 1345.

At trial, Mr. Weinberg testified that, as a result of the City's activities in violation of his First Amendment rights, he suffered monetary losses in terms of both lost or missed "street sales" - that is, in-person sales that would have been made on the sidewalks outside of the United Center had the City not

14

curtailed Mr. Weinberg's activities – and in terms of lost or missed "off street sales" – that is, sales that would have been consummated, had the ban not been imposed, via the Internet (either through Mr. Weinberg's website or through amazon.com), through a bookstore, or through an order placed to Mr. Weinberg as a result of a telephone call. The City does not dispute that Mr. Weinberg lost sales, and it does not challenge the book's $13 cover price; it does, however, question Mr. Weinberg's estimates concerning the volume of sales he lost.

With respect to the street sales, the Court finds that Mr. Weinberg's estimates are credible and reasonable. Mr. Weinberg, having been out there selling – first *The Blue Line* and then *Career Misconduct* – was uniquely qualified to gauge both how many nights he would have gone out to sell books, and how many books he would likely have sold each night. Mr. Weinberg testified that, from experience, he could roughly predict and estimate sales activity based upon a variety of factors, including the time of year (whether it was the beginning of the season, or after the first of the year), the particular opponent the Blackhawks were facing, and the Blackhawks' overall record.

Mr. Weinberg testified that, because of the City's actions, he missed three games in February 2001: the San Jose game on February 14, the St. Louis game on February 16, and the Los Angeles game on February 18. Tr. at 114-115. He testified that,

15

given his sales at the games immediately before and after that run, given that St. Louis was the Blackhawks' arch rival, and given that San Jose and St. Louis were two of the best teams in hockey at the time, he estimates - conservatively, in his view - that he would have sold 40 books at each of those three games. The Court credits this testimony and is persuaded that Mr. Weinberg has proven these lost sales to a reasonable degree of certainty.

Next, Mr. Weinberg testified that, because of the City's actions, he was precluded from selling his book at 17 regular games and two playoff games during the 2001-2002 season. He estimated, given his track record, that he would have attended roughly 15 of the regular season games and both of the playoff games. He further testified that he thinks he would have sold anywhere from 22 to 25 books per game during the regular season, and 30 books per game during the playoffs.

At trial, the City attempted to rebut Mr. Weinberg's testimony concerning the number of games he says he would have attended. And it is true that the record shows a sharp drop-off in the number of games he attended during the seasons following the Court of Appeals' decision in his favor. But Mr. Weinberg testified that he sold at fewer games during that period because, in addition to selling his book, he was holding down a job at a law firm and also handling some cases he had obtained on his own.

16

In other words, things had changed dramatically for Mr. Weinberg: his testimony makes clear that, from the time *Career Misconduct* was published until the time the Court ruled against him, Mr. Weinberg was able to devote 100% of his professional energy to the endeavor of selling his book and getting his views about Bill Wirtz out there; when he lost the right to do that – temporarily, as it turned out, though of course he had no way of knowing that at the time – he took a day job, as it were. Thus, any comparison with his attendance record during the post-decision seasons is imperfect. The Court is persuaded that, had the City not violated Mr. Weinberg's rights, his attendance during the 2001-2002 season would have been more akin to his attendance during the 2000-2001 season, when he was still wildly enthusiastic. The Court accepts Mr. Weinberg's testimony that he would have attended 15 of the 17 regular 2001-2002 season games he missed.

With respect to the playoff games, according to Mr. Weinberg, such a game would be more likely to draw members of his audience – that is, hard-core hockey fans; the City does not dispute this testimony. Thus, the Court is persuaded that Mr. Weinberg would have attempted to sell his books at both playoff games in the 2001-2002 season.

Additionally, with respect to these games, the Court is satisfied that Mr. Weinberg's sales estimates are reasonable, and

possibly even conservative. Based on the sales records for the previous season, and based upon the fact that the Blackhawks were winning for the first time in years, the Court is satisfied that Mr. Weinberg would have sold an average of 23.5 books[2] per game during the regular season and 30 books per game during the playoffs.

Next, the evidence shows that Mr. Weinberg missed 11 regular season games during the 2002-2003 season. According to his testimony, he would likely have attended 8 of those games, and he would have sold 13 books at each of those games. Again, although the City seeks to attack Mr. Weinberg's attendance estimate based upon his record during the period following the Court of Appeals' decision, the Court is not persuaded by those arguments. The Court credits Mr. Weinberg's testimony on this issue and will award Mr. Weinberg damages accordingly.

Thus, in total, using as a starting point his hand-written sales records from the 2000-2001 season, and his typed records from the 2002-2003 and 2003-2004 seasons – the admissibility and accuracy of which are undisputed – as well as his unique knowledge and experience in this particular endeavor, Mr. Weinberg estimated that he lost a total of just over $8,000.00 in street sales. For the reasons explained, the Court finds that

---

[2]The Court is taking the average here of Mr. Weinberg's estimates.

18

this estimate for lost street sales is reasonable and well supported in the record. Accordingly, the Court will award Mr. Weinberg $8,274.50 in lost street sales. This amount represents lost sales from the 3 home games in February 2001 (40 books per game), 15 of the 17 regular season home games in the 2001-2002 season (23.5 books per game), the 2 playoff games in the 2001-2002 season (30 books per game), and 8 of the 11 regular season games in the 2002-2003 season (13 books per game) - all at $13 per book.

Next, the Court considers damages from lost "off-street sales." Mr. Weinberg testified that, during the year 2001, the only year in which he was basically out on the sidewalks continuously, except for the three games in February, his total income from book sales - street sales, plus off-street sales - was roughly $21,000. Tr. at 133, 135. He further testified that the $21,000 consisted of about $9,000 in street sales, and $12,000 in off-street sales. Tr. at 138. And he also testified that his being out on the street, selling the book and interacting with the fans, "absolutely increased [his] off-street sales." Tr. at 138. It is true, as the City has argued, that Mr. Weinberg never conducted a scientifically defensible study to determine whether this proposition was, in fact, true. But it is also true that, during the period when he was banned from selling his book on the streets and sidewalks, his off-street sales

19

diminished. And certainly the ban is at least one likely –
probably the most likely – culprit in that drop; indeed, the City
has offered no other explanation for the drop.

Mr. Weinberg testified that, based upon his bookkeeping
records from the 2000-2001 season, he estimated that the ratio of
street sales to off-street sales was 1:1.25. But Mr. Weinberg
admitted at the trial that his records were less than perfect; he
testified that he may have either missed certain deposits, or
mislabeled certain deposits. And he gave no testimony concerning
how the difference in price between the two types of transactions
might have affected his records; he testified that he sold the
book for $13 at the United Center, but charged $15.95 for the
book when it was sold at a bookstore or via the Internet, and he
testified that the bookstores typically kept 40% of the sales
price, all of which could have skewed his numbers.

Additionally, he testified that, with respect to his sales
of The Blue Line, 99% of his business came from street sales.
Tr. at 45. Whereas, if his testimony is to be credited, for
Career Misconduct, his street sales accounted for just 43% of his
total business. At first blush, this seems odd and suggests that
Mr. Weinberg's estimates for off-street sales are, as the City
argues, exaggerated. But Mr. Weinberg testified that he waged a
significant marketing campaign for Career Misconduct – he
advertised in The Crease, he designed a website, he promoted his

20

book on various radio programs, he pushed to have his book sold in the major Chicago-area bookstores, and he ensured that the book got written up in the area newspapers. He did none of these things with respect to *The Blue Line*, and these efforts could easily account for the difference in the street sales to off-street sales ratio for the two products. Accordingly, the Court is persuaded that Mr. Weinberg's 1:1.25 ratio estimate should be credited.

While the ratio would tell the Court how many books Mr. Weinberg would have sold via off-street channels, the ratio does not tell the Court how much money Mr. Weinberg would have received from those sales. And this is a problem because, unlike the street sales, which were uniformly achieved at $13 per book, the amount of money generated from the off-street sales differed depending on how and where the book was sold. For example, according to Mr. Weinberg's testimony, he made roughly $13 for books sold through Verza, the credit card company that facilitated sales through his website, but he made just 60% of the purchase price - or $9.57 - on books sold through bookstores. Because the record does not permit the Court to make specific findings on how many books Mr. Weinberg would have sold through each of the distinct off-street sale avenues, the Court will use the lowest possible income figure for all of the sales supported in the record. An estimate based on this figure is supported in

the record with the degree of certainty required under the law. Thus, the Court will value each off-street sale at $9.57.

In sum, based upon the above finding that Mr. Weinberg lost 636.5 street sales as a result of the City's actions, the Court finds that Mr. Weinberg's off-street sales should have numbered somewhere in the neighborhood of 795.6, and would in turn have generated approximately $7,600. Because the record shows that Mr. Weinberg, in fact, earned just $3,000 from off-street sales during the relevant period, the Court will award him $4,600.00 in damages in connection with lost off-street sales.

In addition to the lost sales damages, Mr. Weinberg asks the Court to award damages for emotional distress and mental anguish, and for the harm he suffered by virtue of the fact that his constitutional rights were violated. As the Court explained above, Mr. Weinberg is not entitled to damages simply because his rights were violated; rather damages are permitted in cases such as this one only where the plaintiff is actually injured as a result of that constitutional violation. *See Carey, supra; Stachura, supra.* Here, however, Mr. Weinberg's testimony can fairly be read to establish that he *was injured* by the City's actions – he was deprived for a time of the right to convey his message and his views about Bill Wirtz, views reflected in a book that took a year of his life to research and write, and that took an emotional toll, as well as a financial toll. As the Seventh

22

Circuit noted, "Weinberg's speech is related to the book and to the sale of such a book. Prohibiting Weinberg from selling his book prevents the message of *Career Misconduct* from being disseminated." *Weinberg*, 310 F.3d at 1045. As corny as it might sound, when the City banned Mr. Weinberg from selling his book, part of his dream died, and he was necessarily affected by that. To be clear, however, the damages spring not from the fact that his rights were violated, but from the emotional or mental injury he suffered as a result of that violation.

Turning to the extent of the emotional toll, the testimony establishes that Mr. Weinberg was agitated, distracted, tense, and edgy after losing his fight to sell his book at the United Center; he lost sleep (though not much), he missed at least one movie, he lost his ability to concentrate at times, and his ability to interact socially with others diminished, not to mention the fact that he was forced to resort to another law firm job to support himself. Based upon the testimony of Ms. Fisch and Mr. Weinberg, the Court finds that Mr. Weinberg is entitled to $2,500 in damages for the emotional harm and general damage to his psyche that resulted from the City's violation of his constitutional rights. This sum is admittedly somewhat arbitrary and not readily calculable from the record evidence. But that is the nature of this type of an injury; that does not make the injury any less compensable under §1983.

In sum, having considered the evidence presented, the Court finds that Mr. Weinberg is entitled to recover damages from the City of Chicago as follows:

for lost street sales: $8,274.50;

for lost "off-street" sales: $4,600.00; and

for the emotional/mental injury he suffered as a result of being denied the opportunity to disseminate his views about Bill Wirtz: $2,500.00.

Accordingly, the Clerk is directed to enter judgment in favor of Mr. Weinberg in the amount of $15,374.50.

Dated: February 16, 2005

E N T E R:

ARLANDER KEYS
United States Magistrate Judge